**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| ATTORNEYS TITLE GUARANTY FUND, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | Index No. |
| v. ) | |
| ) | **SUMMONS** |
| BRITANI BACHE, BBNDD LLC (D/B/A ) | |
| KOOTENAI COUNTRY TITLE), LEGACY ) | |
| CAPITAL 26 LLC, AND UNLIMITED FUNDING ) | |
| GROUP LLC, AND CHANAN FUZAILOV ) | |
| ) | |
| Defendants. ) | |
| ) | |

To the above-named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service, or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiff designates New York County as the place of trial. The bases for venue are Defendants' principal places of business, location of events in question, and forum selections under the relevant agreements.

Dated: New York, NY

November 13, 2023

**DORSEY & WHITNEY LLP**

*/s/ Anthony P. Badaracco*
Anthony P. Badaracco
Stephen Weingold
Greg Tamkin (*pro hac vice forthcoming*)
51 West 52nd Street
New York, New York 10019
Tel: 212.415.9200
Fax: 212.953.7201
badaracco.anthony@dorsey.com
weingold.stephen@dorsey.com
tamkin.greg@dorsey.com

***Attorneys for Plaintiff Attorneys' Title Guaranty Fund, Inc.***

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| ATTORNEYS TITLE GUARANTY FUND, INC. )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BRITANI BACHE, BBNDD LLC (D/B/A )<br>KOOTENAI COUNTRY TITLE), LEGACY )<br>CAPITAL 26 LLC, AND UNLIMITED FUNDING )<br>GROUP LLC, AND CHANAN FUZAILOV )<br>)<br>Defendants. )<br>) | Index No.<br><br>**COMPLAINT** |

Plaintiff, Attorneys Title Guaranty Fund, Inc. ("ATGF"), by and through its attorneys,

Dorsey & Whitney LLP ("Dorsey"), on its own behalf and as subrogor, brings this Complaint

against Britani Bache ("Bache"), BBNDD LLC, d/b/a Kootenai Country Title ("Kootenai"),

Legacy Capital 26 LLC ("Legacy"), Unlimited Funding Group LLC ("Unlimited"), and Chanan

Fuzailov ("Fuzailov," and collectively with Kooteani, Legacy, Unlimited, and Bache,

"Defendants"), and alleges as follows:

**NATURE OF THE PROCEEDING**

1.      During eleven days in September of 2022, working in concert with Legacy and

Unlimited, Bache and Kootenai misappropriated more than a million dollars of monies that

prospective buyers had placed in escrow with Kootenai.  Specifically, knowing that the funds

were placed in escrow by unsuspecting purchasers, Defendants stole approximately $1.087

million that did not belong to them, but had been entrusted to Kootenai, the title company Bache

owns and operates with another member.

2.      Because the funds were never delivered on behalf of certain real estate buyers to

the sellers or sellers' mortgage lenders, those unsuspecting buyers and mortgage lenders have made title policy claims against ATGF, a title insurer.  ATGF now brings this action to recover the monies that were stolen from its policy holders.

3.      The scheme employed by Defendants was elaborate.  Legacy and Unlimited held themselves out as "factoring companies": entities who provide loans based on proven receivables.  Here, Bache and Kootenai provided Legacy and Unlimited with direct access to information for the account containing Kootenai trust funds which indicated that the money in the account was trust money, not receivables.  The banking information they provided demonstrated that the funds coming into and out of Kootenai's account over time were mostly third-party wires used to fund real estate transactions.  Defendants then "factored" these escrowed funds, none of which were actually receivables, but instead were monies that were supposed to be used to purchase real estate.  In less than two weeks, at the direction of Fuzailov, Legacy and Unlimited advanced approximately $1 million dollars based on their analysis of the escrow account and in return withdrew and/or were wired more than $2 million of escrowed funds.  The money they withdrew or received did not belong to Kootenai.

4.      Each Defendant had full access to the information concerning the source of the funds and the fact that the funds were merely escrowed and had been entrusted to Kootenai, as a fiduciary.  Each Defendant was therefore fully aware that using the funds entrusted to Kootenai for a purpose other than that for which they were entrusted was highly improper.  Certainly, misappropriating those funds to pay sham "factoring" expenses or to obtain additional funding was a breach of Kootenai's fiduciary obligations.

5.      Ostensibly, Bache and/or Kootenai were effectively "borrowing" the approximately $1 million—for about two weeks—at a usurious interest rate.  Remarkably, in

those two weeks, neither Bache nor Kootenai used or withdrew the funds advanced by Legacy and Unlimited.  And, at the end of the two weeks, even though there was no benefit of pre-payment and the entire cost of the funds was still due, Bache and Kootenai not only wired the full outstanding amount due back, they actually wired amounts totaling $258,000 more than Unlimited and Legacy were contractually supposed to receive.  Legacy and Unlimited have acknowledged that there was an over-payment, but have not refunded any of that amount.

6.      Upon information and belief, Unlimited and Legacy made short-term, high-interest loans to Bache and/or Kootenai and then collected on those "loans" with escrowed funds in exchange for undisclosed benefits to Bache and/or Kootenai.

7.      Fuzailov, an officer, director, and/or owner of both Unlimited and Legacy, actively participated in and directed this scheme.  He arranged the purported factoring contracts that Unlimited and Legacy issued to Bache and/or Kootenai, helped Bache take steps to hide Unlimited and Legacy's involvement in her bank account, and participated in and/or directed the withdrawal of funds escrowed with Kootenai.

8.      The clear goal of Defendants' collective scheme was simple:  their sham transactions would allow the Defendants to misappropriate escrowed funds from the innocent customers who trusted Kootenai and Bache.

9.      ATGF brings this action to recover the escrowed funds stolen from its insureds as subrogor and on its own behalf.

## THE PARTIES

10.      Plaintiff ATGF is a Colorado Corporation with its principal place of business in Colorado.  ATGF is a title insurance underwriting company. Originally formed over 60 years ago as a bar-related title insurance fund exclusively for attorneys handling real estate transactions in

Colorado and Utah, ATGF has leveraged its significant expertise in serving title agents and agencies of all sizes in their real property transactions to now support both attorney and non-attorney independent title agents in Colorado, Utah, Minnesota, Montana, North Dakota, Arizona, Alabama, Louisiana, and Mississippi and is licensed to operate in 13 other states. Each year, ATGF issues tens of thousands of insurance policies and commitments.

11.    Defendant Bache is a resident of Montana.

12.    Defendant Kootenai is a Montana Limited Liability Company with its principal place of business in Libby, Montana. Bache is a 50% member of Kootenai and its exclusive manager. Kootenai was a title agent for ATGF and entered an agency agreement to sell ATGF policies.

13.    Defendant Unlimited is a New York Limited Liability Company with its principal place of business in New York, New York.

14.    Defendant Legacy is a New York Limited Liability Company with its principal place of business in Nassau County, New York.

15.    Defendant Fuzailov is an individual residing in New York.

## JURISDICTION AND VENUE

16.    This Court has personal jurisdiction over Defendants Unlimited and Legacy pursuant to CPLR 301, because they are domestic corporations with their principal places of business in the State of New York and because they agreed to submit to the jurisdiction of this Court.

17.    This Court has personal jurisdiction over Defendant Fuzailov pursuant to CPLR 301 because he is an individual who resides in the State of New York.

18.    This Court has personal jurisdiction over Defendants Kootenai and Bache

pursuant to CPLR 302(a)(1), because the tortious scheme set forth in this complaint occurred in New York as escrowed funds were wired and transferred to New York, because their sham contracts with Unlimited and Legacy were signed in New York and specify that they "encompass . . . the transaction of business within the City of New York," and because the parties to those agreements agreed to venue in New York.

19.     Venue is proper in this Court pursuant to CPLR 501 because Legacy and Unlimited agreed to submit to the jurisdiction of this Court and to waive any objections to venue, pursuant to CPLR 503(a) because upon information and belief Defendant Fuzailov is a resident of New York County, pursuant to CPLR 503(c) because Defendant Unlimited principal office is located in New York County, and pursuant to CPLR 502.

## FACTUAL BACKGROUND

### I.     Bache and Kootenai's Business Operations

20.     Bache exclusively operated and managed Kootenai, which provided title insurance agent services to her customers, who were mortgage lenders, buyers, and sellers of real estate in Montana.

21.     As part of Kootenai's services, Kootenai acted as an escrow agent for real estate transactions, received monies from buyers and mortgage lenders to close on the sale of real estate.

22.     As an escrow agent, Kootenai served as a fiduciary for its customers and held their funds before transferring them to appropriate parties entitled to receipt of said funds.

23.     As an escrow agent, Kootenai had a fiduciary duty to preserve each customer's funds and to transfer them to the appropriate party.

24.     Kootenai had a fiduciary duty to act for the benefit of the owners of the funds it

7

held in escrow.

25.    As a title insurance agent, Kootenai placed title insurance for its customers with ATGF pursuant to an Agency Agreement for Appointment of Policy-issuing Agent for Attorneys Title Guaranty Fund, Inc. dated January 11, 2022 (the "Agency Agreement").

26.    This title insurance provides coverage for various issues that can arise in connection with the purchase of real property, including, in some circumstances, for losses incurred when a party does not receive clear title to real estate, after meeting all closing conditions.

27.    Kootenai publically advertised that it protected property rights and ownership, protected its clients' funds and personal information, and conducted transactions with integrity.

28.    Kootenai had a duty to procure title insurance business in accordance with the Agency Agreement, and to exercise a duty of care in negotiating insurance on ATGF's behalf.

29.    As Kootenai's principal and manager, having the full, exclusive, and complete right to control Kootenai, Bache shared this duty.

30.    Kootenai stored its customers' escrowed funds in an account with Glacier Bank, account number ending 5376 ("Glacier Bank Account").

31.    Incoming funds were clearly identified in the banking information when received and contained descriptors including the name and address for the individual for whom they were to be held and a description of what they were for (for example, earnest money for a plot of land at a particular address).

## II.    Defendants Scheme to Convert Funds Escrowed with Kootenai

32.    On or about September 2022, Bache and Kootenai coordinated with a "broker" to enter into relationships with a number of purported lenders, including Unlimited and Legacy, who offered to lend money to Kootenai and/or Bache at very high rates of interest which would

be repaid using escrowed funds held by Kootenai.

33.     Bache and/or Kootenai intended to enter sham "factoring" contracts with Unlimited and Legacy to advance funds against receivables.

34.     But title agents do not have receivables.  They are paid at closing, and payment is contingent upon the closure of a transaction.  Payment is made immediately when it becomes due.  There is thus no future payment obligation or receivable to factor.

35.     Thus, Bache and Kootenai were not offering receivables—they were offering the funds in the account.  Bache and Kootenai knew that those funds were not "receivables" and that the bank account information would disclose to Unlimited and Legacy that the funds were not "receivables," either.

36.     Upon information and belief, Unlimited and Legacy are overlapping entities with shared leadership structures, managers, and/or members.  All actions with respect to Bache and Kootenai taken by Unlimited and Legacy were directed by Fuzailov.

37.     Upon information and belief, Fuzailov was a principal affiliated with both Unlimited and Legacy.

38.     Upon information and belief, unlike any legitimate company engaged in factoring receivables, Unlimited and Legacy have no public presence, no websites, and no publicly available phone numbers.

39.     The purpose of the "factoring" contracts was not to be compensated for providing traditional factoring services to a business owner.  Instead, their goal in this transaction was to misappropriate escrowed funds and prevent any tracing of the funds once wired out.

40.     Kootenai and Bache knew they lacked accounts receivable to be factored to pay off the money they would receive from Unlimited and Legacy.

41.     Kootenai and Bache knew that their arrangements would lead to the transfer of trust funds escrowed with Kootenai to Unlimited and Legacy.

42.     Unlimited and Legacy were provided access to the Glacier Bank Account and reviewed transactions in that account.  They were aware that Kootenai was engaged in the title and escrow businesses and that the funds in the account were primarily escrowed funds.  In addition, they could determine that Kootenai and Bache did *not* have factorable accounts receivable associated with the account.

43.     Unlimited and Legacy knew, or should have known, that Kootenai and Bache were not authorized to transfer escrowed funds to them.

44.     Ultimately, Defendants entered into a series of agreements where Unlimited and Legacy would be "factoring" the escrowed funds.  But these were sham agreements; there were no receivables being factored.  Rather, there was a scheme to place money into the Glacier Bank Account and then withdraw a significantly larger amount from that account that could not be traced directly to Kootenai or Bache.

III.    **Defendants Convert Funds Escrowed with Kootenai**

45.     Bache, Kootenai, Unlimited, and Legacy set up a series of funding agreements intended to shift funds escrowed with Kootenai to Unlimited and Legacy, structured as follows:

a.      On September 14, 2022, Legacy entered an agreement to transfer $200,000 in return for a repayment of $400,000.  There was no prepayment benefit or penalty, and these funds were to be returned at the rate of $10,000 per day, between Monday and Friday.  The loan would last eight weeks, during which Legacy would double its money.

b.      On September 14, 2022, Unlimited entered into a contract with the same

terms on a virtually identical contract.  It transferred $200,000 in return for a repayment of $400,000, at the rate of $10,000 per day over the same 8 week period.

c.      One week later, on September 21, 2022, Legacy funded an additional $300,000.[1]  This new total amount was to be repaid at the rate of $22,000 per day, and Legacy would receive a total of $880,000 in repayment for its "loan," recouping  $380,000 profit within two months.

d.      The same day, Unlimited entered into a contract with the same terms.  In return for the total $500,000 "loan," Unlimited would receive a $380,000 profit within two months.[2]

46.     Bache and Kootenai did not make use of the money deposited in the Glacier Bank Account by Unlimited and Legacy on September 14 and September 21, 2022.

47.     Instead, these funds remained in the Glacier Bank Account.

48.     Immediately after depositing the funds, Legacy and Unlimited began withdrawing via ACH the required daily pay-off amounts.

49.     On September 23, 2022, just three days after it had received another $300,000 from Legacy, Kootenai and Bache wired $792,000 to Legacy.  Between the wire and the amounts that the Legacy withdrew on its own, Legacy received more compensation than provided for in the agreements with Kootenai and Bache.

50.     By Monday September 26, 2022, Bache expressly acknowledged that Kootenai was going to go out of business as a result of the parties' collective efforts to withdraw escrowed

---

[1] The payoff of Legacy's first loan was wrapped into this second loan.
[2] The payoff of Unlimited's first loan was wrapped into this second loan.

funds, yet she wired funds to Legacy well before they were due.

51.     On the same day, Bache and Kootenai wired $760,000 to Unlimited.  Between this wire and the amounts that Unlimited withdrew on its own, Unlimited received more compensation than provided for in the agreements with Kootenai and Bache.

52.     Defendants knew or should have known that these wires contained escrowed funds.

53.     Over eleven days, between September 16, 2022 and September 27, 2022, Legacy received $942,000 for the $500,000 it loaned.

54.     Over eleven days, between September 16, 2022 and September 27, 2022, Unlimited received $1,145,000 in return for the $500,000 it loaned.

55.     Legacy received even more than it was due under its sham contracts—it underfunded its September 21 contribution by $15,000.  As a result of the interest rate Legacy charged, this incorrectly inflated Kootenai's repayment by $24,000.  On top of this, Legacy received an extra $22,000 payment it was not owed by withdrawing an extra ACH, for a total overpayment of $46,000.

56.     Unlimited also received even more than it was owed under the parties' sham contracts.  It underfunded its second loan by $125,000.  As a result of the interest rate charged by Unlimited, this led to a total payback of $200,000 more than was required under the parties' agreements.  Additionally, Unlimited received an overpayment of $12,000 when the loan was paid off, for a total overpayment of $212,000.

57.     Unlimited and Legacy were notified of these overpayments by letter in November 2022 and have not disputed the overpayment.  Nevertheless, they have failed to return the $258,000 in excess funds they misappropriated.

58.     Upon information and belief, Fuzailov, Unlimited, Legacy, and their broker knew Bache and Kootenai lacked any accounts receivable that would allow them to pay back approximately $1 million in two months.

59.     Instead, Defendants' goal was to facilitate the misappropriation of funds escrowed at Kootenai.

60.     Unlimited and Legacy participated in this scheme to use escrowed funds to provide additional benefits to Bache and/or Kootenai and themselves.

61.     Upon information and belief, the documents Defendants signed in connection with these transactions are sham instruments meant to facilitate the conversion of escrowed funds and to hide the improper business arrangements between Defendants. Unlimited and Legacy did not transmit money to Kootenai in accordance with the terms of these documents, and Kootenai and Bache did not transfer money to Unlimited and Legacy in accordance with these documents.

**IV.     Fuzailov's Actions to Facilitate the Defendants' Scheme**

62.     Fuzailov is an officer, director, and/or owner of Unlimited and Legacy and directs their actions.

63.     Fuzailov communicated with Bache on behalf of both Unlimited and Legacy.

64.     Fuzailov arranged the transmittal of the fake 'factoring' contracts for both Unlimited and Legacy.

65.     Fuzailov had full access to Kootenai's bank accounts after obtaining access on September 15, 2022.

66.     Fuzailov acted to hide the conversion of funds escrowed by Kootenai by inducing Bache to change Kootenai's banking password so that people "would not see [Kootenai] wiring"

money to Fuzailov's factoring companies.

67.     Fuzailov directly participated in the wiring of funds escrowed with Kootenai to Unlimited and Legacy.

**V.     The Impact of Defendants' Misappropriation**

68.     In October 2022, ATGF discovered Defendants' scheme when Kootenai customers came to the shocking realization that the funds they had escrowed to purchase real estate had not been transferred as directed and, instead, had disappeared.  Many of those defrauded purchasers had purchased title insurance through Kootenai as agent for ATGF and thus had ATGF policies.

69.     As a result, the insured purchasers and mortgage lenders made title insurance claims on ATGF, some of which have now been paid.

70.     The $1,087,000 in escrowed funds that Defendants misappropriated have led to title insurance claims and other losses exceeding $1,087,000.

71.     On or around November 1, 2022, ATGF demanded that Unlimited return the escrowed funds it obtained from Kootenai.

72.     On or around December 13, 2022, ATGF demanded that Legacy return the escrowed funds it obtained from Kootenai.

73.     The money has not been returned.

74.     By virtue of their policies, upon being paid by ATGF, the parties whose escrowed funds Defendants misappropriated have assigned their subrogation rights to ATGF.

75.     For example, on August 26, 2022 and September 23, 2022, a total of $308,611.42 was wired to Kootenai in connection with the purchase of 1353 Forest Dr. in Troy, Montana, with a closing date of September 23, 2022.  These funds were to be held by Kootenai in escrow.

Instead, they were transferred to Legacy and Unlimited, prompting a title insurance claim against ATGF.

76.     On September 7, 22, and 23, 2022, a total of $686,727.56 was wired to Kootenai in connection with the purchase of 159 Treasure View Dr. in Libby, Montana.  These funds were to be held by Kootenai in escrow.  Instead, they were transferred to Legacy and Unlimited, prompting a title insurance claim against ATGF.

77.     As part of the process of being a title agent whereby it obtained the funds referenced above, Kootenai entered into a series of title insurance contracts which bound ATGF to guarantee that clear title would pass to policyholders.

78.     Kootenai and Bache acted as ATGF's agent in these transactions, and thus owed a duty of care to act in ATGF's interest in these transactions.

79.     Specifically, Kootenai and Bache had a duty to prudently and carefully examine title on the property to avoid issuing insurance contracts that did not exclude coverage for any liens, encumbrances, or objections that would not be resolved as a prerequisite to coverage.

80.     Title insurance coverage requires the payoff of any existing liens on a property, using escrowed funds, contemporaneously with the closing of a transaction.

81.     Kootenai and Bache bound ATGF to insurance policies even though they knew or should have known that—as a result of their misappropriation of escrow founds—these existing liens on the insured properties had not been extinguished.

82.     Kootenai and Bache continued to bind insurance contracts even though they knew, or should have known, that there were liens, encumbrances, or objections that would (because of the misappropriation of escrowed funds) lead to losses.

83.     When escrowed funds were not used to resolve these liens, encumbrances, or

15

objections, clean title did not pass to several policyholders.

84.     This has led to legitimate claims against ATGF's insurance policies, which ATGF has paid.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Against All Defendants – Conversion)

85.     ATGF repeats and realleges each and every allegation set forth above as if fully restated here.

86.     As an escrow agent, Kootenai had a duty to act as a fiduciary over the funds escrowed with it, to hold these funds in trust, and to transfer these funds in accordance with their beneficiaries' instructions.

87.     Funds escrowed with Kootenai were specific, identifiable amounts that were to be separately held and stored by Kootenai and Bache.

88.     Defendants intentionally, and without authority, assumed or exercised authority and control over funds escrowed with Kootenai.

89.     Defendants knew, or should have known, that the amounts Kootenai and Bache transferred to Unlimited and Legacy in connection with a series of sham transactions were funds escrowed with Kootenai.

90.     The $1.087 million in escrowed funds Unlimited and Legacy obtained over eleven days as part of a series of sham transactions were not received in return for value and were not taken in good faith.

91.     Unlimited and Legacy obtained $1.087 million in funds at a time when they knew, or should have known, that this money was wrongfully obtained from third-parties' escrowed funds.

92.     This amount included $258,000 to which Unlimited and Legacy had no legal

right, even assuming the agreements were not shams.

93.     Fuzailov is an officer, director, and/or owner of Unlimited and Legacy and directs

their actions.

94.     Fuzailov personally took active steps to support and facilitate the fake factoring

loans Unlimited and Legacy used to take funds escrowed with Kootenai.

95.     Fuzailov personally directed the tortious actions Unlimited and Legacy undertook.

As such, he is personally liable for their tortious activities.

96.     The right to recover these escrowed funds has been subrogated to ATGF.

97.     ATGF has demanded the return of these funds from each defendant.

98.     Defendants have refused to return the funds even after being told that they were

misappropriated escrowed funds.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Against Bache and Kootenai – Breach of Fiduciary Duty)

99.     ATGF repeats and realleges each and every allegation set forth above as if fully

restated here.

100.    As an escrow agent, Kootenai had a duty to act as a fiduciary over the funds

escrowed with it, to hold these funds in trust, and to transfer these funds in accordance with their

beneficiaries' instructions.

101.    Kootenai had a fiduciary duty to act as trustee for, and to preserve, the escrowed

funds.

102.    As the principal and exclusive manager of Kootenai, Bache shares this fiduciary

duty.

103.    Instead of transferring escrowed funds to their intended beneficiaries, Kootenai

and Bache knowingly transferred or facilitated the transfer of funds escrowed with Kootenai to

Unlimited and Legacy.

104.    The transfer of escrowed funds to Unlimited and Legacy was a breach of the fiduciary duty owed by Kootenai and Bache.

105.    As a direct result of the transfer of escrowed funds to Unlimited and Legacy, Kootenai customers insured by ATGF were damaged and lost their escrowed funds.

106.    Claims related to these damages have been subrogated to ATGF.

107.    The damages from these losses are still ongoing, and have exceeded the $1,087,000 improperly withdrawn from the account.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Against Fuzailov, Unlimited, and Legacy – Aiding and Abetting Breach of Fiduciary Duty)**

108.    ATGF repeats and realleges each and every allegation set forth above as if fully restated here.

109.    Kootenai and Bache owed fiduciary duties to the beneficiaries of the money they held in escrow, and they breached that fiduciary duty by transferring escrowed funds to Unlimited and Legacy.

110.    Unlimited and Legacy had full access to Kootenai's Glacier Bank Account.

111.    Unlimited and Legacy reviewed transactions in those accounts, knew that Kootenai and Bache acted as title and escrow agents, and had information that the Glacier Bank Account contained funds escrowed with Kootenai.

112.    Unlimited and Legacy knew that the payments they actively drew from the Glacier Bank Account were escrowed funds.

113.    Unlimited and Legacy knew that the amounts Bache and Kootenai transferred to them were escrowed funds.

114.    Unlimited and Legacy actively participated in and facilitated the transfer of these

funds, even though they knew their transfer would breach Bache and Kootenai's fiduciary duties to the beneficiaries of the escrowed funds.

115.    Unlimited and Legacy engaged in sham transactions with Kootenai which actively facilitated and participated in Bache and Kootenai's breach of their fiduciary duty.

116.    Fuzailov is an officer, director, and/or owner of Unlimited and Legacy and directs their actions.

117.    Fuzailov personally took active steps to support the aforementioned activities.

118.    Fuzailov personally directed the tortious actions Unlimited and Legacy undertook. As such, he is personally liable for their tortious activities.

119.    As a direct result of the transfer of escrowed funds to Unlimited and Legacy, Kootenai customers insured by ATGF were damaged and lost their escrowed funds.

120.    Claims related to these damages have been subrogated to ATGF.

121.    The damages from these losses are still ongoing, and have exceeded the $1,087,000 improperly withdrawn from the account.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**<u>(Against Kootenai and Bache – Negligence)</u>**

122.    ATGF repeats and realleges each and every allegation set forth above as if fully restated here.

123.    Kooteani and Bache were title agents authorized to act on ATGF's behalf to issue title insurance.

124.    Bache was a licensed title agent.

125.    As ATGF's agents, Kootenai and Bache owed duties of care to ATGF, including a duty to act as a reasonable title agent would in representing ATGF and performing title agent services.

126.     This duty included a duty not to issue insurance agreements which Kootenai and Bache knew, or should have known, would be unfavorable to ATGF.

127.     Kootenai and Bache also had a duty to accurately show the condition of the title to the subject property and the conditions which must be fulfilled prior to the issuance of a title insurance policy.

128.     The pay-off of the existing mortgage on a property (i.e., the seller's mortgage), using funds from the purchaser and the purchaser's mortgage lender, is a prerequisite to the issuance of an ATGF insurance contract.

129.     Kootenai and Bache did not meet this obligation or observe this condition precedent.  Instead, they issued a series of insurance policies which did not exclude from coverage liens and other title defects which were to be paid off with escrowed funds.

130.     Kootenai and Bache knew, or should have known that, as a result of their misappropriation, escrowed funds would not be used to resolve these issues.

131.     As ATGF's agents, Kootenai and Bache owed duties of care to ATGF, including duty to act as a reasonable title agent would in representing ATGF and performing escrow services.

132.     Kootenai and Bache knew that they had an obligation to separately store and preserve escrowed funds in a separate trust account.

133.     Kootenai and Bache acted with reckless disregard for this obligation when they mixed escrowed funds with other funds in a single business account.

134.     As a result of this conduct, which fell below the standard of care, Kootenai and Bache bound ATGF to insurance policies insuring titles that were not clean and exposed funds escrowed with Kootenai to conversion by Unlimited and Legacy.

135.    ATGF has incurred losses as a result of these title defects and the conversion of escrowed funds in an amount that is still increasing, but will be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Against Kootenai – Breach of Agency Agreement)**

136.    ATGF repeats and realleges each and every allegation set forth above as if fully restated here.

137.    Kootenai entered into the Agency Agreement with ATGF.

138.    ATGF fulfilled all of its obligations under the Agency Agreement.

139.    The Agency Agreement required Kootenai to act in a "timely, prudent, and ethical manner, with due regard to generally accepted title insurance underwriting practice standards" and in accordance with ATGF's guidelines.

140.    In issuing title insurance policies which would give rise to covered claims as a result of its misappropriation of escrowed funds, Kootenai did not act in accordance with the requirements of the Agency Agreement.

141.    This breached the Agency Agreement.

142.    ATGF has been forced to pay out claims and incurred other losses as a result of Kootenai's issuance of these polices in breach of the Agency Agreement.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Against All Defendants – Unjust Enrichment)**

143.    ATGF repeats and realleges each and every allegation set forth above as if fully restated here.

144.    ATGF brings this claim both in its own right and as subrogor.

145.    Defendants have collectively obtained at least $1,087,000 in funds escrowed with Kootenai.  Defendants have retained the benefit of these funds.

146.     These funds belonged to the escrow beneficiaries.

147.     ATGF's subrogees were thus deprived of $1,087,000 in escrowed funds.

148.     Bache and Kootenai were not entitled to receive any portion of the escrowed funds, and it would be unjust for them to retain any of the benefits they received as a result of transferring the exercised funds to Unlimited and Legacy.

149.     Because Unlimited and Legacy knew they would draw escrowed funds from Kootenai's bank account to recoup the money they purported to loan to Bache and Kootenai, they did not bear any risk in connection with the sham transactions in which they participated, which led them to more than double their money in eleven days.

150.     Unlimited and Legacy obtained $1,087,000 in escrowed funds even though they knew these funds were not accounts receivable and did not belong to Bache or Kootenai.  In fact, they have admitted that $258,000 was taken, but should not have been.

151.     Defendants have not returned the escrowed funds they obtained.

152.     It is against equity and good conscience for Defendants to retain the $1,087,000 in escrowed funds they obtained.

**WHEREFORE**, Plaintiff ATGF prays that this Court enter judgment in favor of Plaintiff ATGF and against all Defendants as follows: (1) the $1,087,000 in escrowed funds; (2) accrued interest, fees, and costs; (3) the consequential damages that ATGF's subrogees have suffered as a result of Kootenai's failure to transmit escrowed funds at the appropriate times; (4) and such other and further relief that this Court deems just and proper.

## Jury Demand

Plaintiff demands a trial by jury.

Dated:  New York, NY                    **DORSEY & WHITNEY LLP**

November 13, 2023                       */s/ Anthony P. Badaracco*
                                        Anthony P. Badaracco
                                        Stephen Weingold
                                        Greg Tamkin (*pro hac vice forthcoming*)
                                        51 West 52nd Street
                                        New York, New York 10019
                                        Tel: 212.415.9200
                                        Fax: 212.953.7201
                                        badaracco.anthony@dorsey.com
                                        weingold.stephen@dorsey.com
                                        tamkin.greg@dorsey.com

                                        ***Attorneys for Plaintiff Attorneys' Title Guaranty Fund, Inc.***

23